**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RAYSHAWN J. PENN,

        Plaintiff,

    v.

C.O. EASH, et al.,

        Defendants.

Case No. 1:22-cv-262

McFarland, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff, an incarcerated individual who proceeds *pro se*, tendered a complaint against Defendant Correctional Officer Eash and two institutional defendants. (Doc. 4). Plaintiff amended his complaint on July 25, 2022. (Doc. 9). Although some claims were dismissed on initial screening, the Court permitted Plaintiff's excessive force claim against Defendant Eash to proceed. (Docs. 20, 28). Pending before the Court are the parties' cross-motions for summary judgment. (*See* Docs. 30, 31, 37). For the reasons stated, Defendant's motion for summary judgment, (Doc. 37), should be GRANTED and Plaintiff's motions, (Docs. 30, 31),[1] should be DENIED.

I.    **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[1]Plaintiff filed two separate (duplicative) motions for summary judgment.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).

Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere scintilla of evidence to support the nonmoving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252. Where both parties have moved for summary judgment, the Rule 56 standard remains the same. Thus, in evaluating Plaintiff's pending motion, the Court will construe any factual disputes in favor of the Defendants. By contrast, in evaluating whether Defendant should prevail, the Court has drawn all reasonable inferences in Plaintiff's favor. See *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir.1994) (explaining that a court must evaluate each motion for summary judgment on its own merits).

Because Plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). That said, a litigant's pro se status does not alter his burden of production to support his own motion for summary judgment, nor does it alter his burden supporting his factual assertions with admissible evidence when faced with a defendant's summary judgment motion. *Maston v. Montgomery Cnty. Jail*

*Med. Staff Personnel*, 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010)).

**II.    Findings of Fact[2]**

Plaintiff is presently incarcerated at the Southern Ohio Correctional Facility. In October 2021, Plaintiff was incarcerated at the Lebanon Correctional Institution ("LeCI"). Around 11:30 pm on October 25, 2021, Plaintiff was escorted to a room to complete a "pack up" for him to be moved from his cell to a restricted housing unit at LeCI.

Defendant Correctional Officer Eash was assigned to pack up Plaintiff. During the pack up, Plaintiff was seated in a chair and was fully restrained by leg irons and hand restraints. Plaintiff alleges in his verified amended complaint that he asked Defendant to pack his durag, which Plaintiff considers to be religious head gear. Defendant declined. An institutional investigation of the incident contains a statement from Defendant that Plaintiff "began arguing with the officer about getting a doo rag with his stuff," and insisting that the head scarf is "religious head gear" based on Plaintiff's Rastafarian beliefs. (Doc. 37-6, PageID 270).

At this point, the parties' accounts diverge. Defendant reported to an institutional Use of Force ("UOF") investigator that he told Plaintiff that the durag was not religious head gear, but agreed to double-check and if permitted, stated that he would bring it to Plaintiff later. Defendant further reported that after Plaintiff "continued to argue," Defendant ordered him to stand up and return to his cell. Defendant stated to the investigator that Plaintiff refused and invited Defendant to pepper spray him. (Doc. 37-6, PageID 256). He reported that he took hold of Plaintiff to force compliance with his verbal

---

[2]The Findings of Fact primarily reflect undisputed facts, but note where appropriate any issues that remain in dispute.

order. In Defendant's account, while Defendant was moving Plaintiff through a doorway to the hallway, "plaintiff either fell or went deadweight causing Defendant to lose his balance, and unintentionally fall somewhat on Plaintiff after trying to avoid landing on him." (Doc. 37, PageID 194-195). After Plaintiff fell, Defendant states he called for a supervisor. (*Id.*)

No sworn testimony supports Defendant's account; instead, Defendant cites to his unsworn statements in the UOF investigation. However, the UOF Committee found those statements to be inconsistent. (Doc. 37-6, PageID 253). There is no audio recording on the video file submitted to the Court that could corroborate whether Defendant gave Plaintiff a verbal command. And the images are ambiguous as to whether Plaintiff took any action to go limp or otherwise to intentionally cause himself and Defendant to fall.

In Plaintiff's account set forth in his verified amended complaint,[3] Plaintiff admits to disagreeing with Defendant about whether he could take his blue state shirt and durag to the restricted housing unit. But he denies that Defendant ordered him to stand and return to his cell. Plaintiff states that after he requested to speak to a supervisor, Defendant Eash became "very upset about this request" and reacted in a "sadistic manner." (Doc. 9 at PageID 58). Plaintiff told the UOF investigator that after refusing to call for a supervisor, Defendant "just jerked me out of the chair in restraints and leg irons" and dragged him down a hallway. (Doc. 37-6, PageID 259; *see also* Doc. 9, PageID 58-59). Plaintiff alleges that being dragged "caused me to scuff up my legs and knees, which

---

[3]A verified complaint equals a declaration made under penalty of perjury as to any facts asserted based on personal knowledge that would be admissible in evidence, but not as to legal conclusions to be drawn from those facts. *Healthy Advice Networks, LLC v. Contextmedia, Inc.*, No. 1:12-cv-610-SJD, 2014 WL 5588444, at *4 (S.D. Ohio Nov. 3, 2014).

caused cuts and bruises." (Doc. 9, PageID 59). He further states that when they fell, Defendant "dropped both his knees in my stomach, causing Plaintiff "extreme" abdominal pain and suffering. (Doc. 9, PageID 59). Plaintiff claims injuries that included "severe abdominal pain, scrapes and bru[i]sing, mental and emotional distress." (Doc. 9, PageID 60).

After an institutional UOF investigation, the Committee Chairman found "the force used on offender Penn….was Not appropriate nor justified under the circumstances." (Doc. 37-6, PageID 253). The Chairman noted that Eash's written statements were inconsistent with the video and the verbal Q and A with Defendant Eash. (*Id*.) The report further states:

> The Chairman viewed the video footage multiple times and found officer Eash actions were unacceptable period. Per the video offender Penn in leg irons and hand restraint[s] with belt sitting in the chair showed No aggressive behavior period and was jerked out of the chair by officer Eash. The Chairman found if officer Eash would have just called for a supervisor and not attempted to drag officer Penn from M-block back to his cell and waited for assistance, they would have never fell in the corridor together. The Chairman has found that offender Penn became argumentative towards officer Eash over a blue state shirt and durag, but could have been avoided if a supervisor was called. The Chairman found that if officer Eash would have made a more prudent decision on this incident that it would have resulted in a better out come. The Chairman found all 4 components on this Use of Force do not meet the force used on this incident. The Use of Force was all self-inflicted due to officer Eash poor judgment.

(*Id*., PageID 254) (spelling and punctuation original).

In support of his motion for summary judgment, Defendant has filed as exhibits three medical reports bearing the date of October 25, 2021. (Doc. 37-5). However, only the third record bears a timestamp that corresponds with the incident at issue.[4] That

---

[4] The first record dated 10/25/21 was signed at 1:40:23 pm by Jennifer Capannari, RN. It notes that Plaintiff was examined for "Use of Force," but that he denied any injuries, with no treatment administered. (Doc. 37-5, PageID 216). The second record was signed less than an hour later at 2:23:04 pm by Darcy Thompson,

record was signed by Jennifer Capannari, RN, at 11:49:05 pm on 10/25/21 and reflects her examination findings for a "Use of Force" incident. The report notes that Plaintiff was in "no distress," with no bruising noted to his abdomen, only a single "[v]ery superficial mark/abrasion post left shoulder" and no bleeding or other visible signs of recent injury noted. (Doc. 37-5, PageID 215). Plaintiff was given 2 doses of Tylenol to take as needed, and instructed to follow up if his symptoms persisted or worsened. (*Id*.)

### III.    Analysis of Cross-motions for Summary Judgment

### A.  Defendant's Renewed Exhaustion Defense

Defendant primarily argues that he is entitled to summary judgment on a procedural ground: Plaintiff's alleged failure to exhaust his administrative remedies. Under the Prison Litigation Reform Act ("PLRA"), prisoners are required to fully exhaust available institutional remedies before filing suit in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983 (2002). Such exhaustion is "mandatory under

---

RN. It reflects Plaintiff's medical classification and appears related to the continuation of treatment in Plaintiff's new restricted housing unit. (Doc. 37-5, PageID 217-218). It contains a list of medical problems that includes cellulitis, an Achilles tendon issue, macular cyst, hole, or pseudohole, fracture of orbital floor, right side, decreased visual acuity, facture of nasal bones, major depressive disorder, unspecified urethritis, and effects of hunger. (Doc. 37-5, PageID 217).

the PLRA and unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 201, 211, 127 S. Ct. 910 (2007).

The Ohio Department of Rehabilitation and Correction ("ODRC") offers a three-step grievance system to every inmate at each of its institutions. Ohio Admin. Code §5120-9-31(J). The first step allows inmates to submit an informal complaint resolution form - commonly known as an "ICR" - to the supervisor of the department or staff member directly responsible for the issue. Step one requires any such complaint or grievance to be submitted no later than fourteen days from the date of the event giving rise to the grievance. Ohio Admin. Code § 5120-9-31(J)(1). Inmates dissatisfied with the results of step one may proceed to step two by obtaining a Notification of Grievance ("NOG") form from the Inspector of Institutional Services and filing a formal grievance. Ohio Admin. Code § 5120-9-31(J)(2). Formal grievances must be submitted within fourteen days from the date an inmate receives a response to his informal complaint at step one. *Id.*

If dissatisfied with the results at step two, the inmate may proceed to step three of the grievance process by requesting an appeal form from the Office of Inspector of Institutional Services and submitting an appeal to the Office of the Chief Inspector at ODRC. Ohio Admin. Code § 5120-9-31(J)(3). The step three appeal must be filed within fourteen days of the date of the disposition of his formal complaint. The Chief Inspector is to provide a written response within thirty calendar days of receiving an appeal, unless he extends the timeframe for good cause and notifies the inmate. *Id.* Decisions of the Chief Inspector are final, meaning that the Ohio Administrative Code provides no further means for appeal. *Id.*

Multiple courts have acknowledged that "the exhaustion affirmative defense is best

7

raised in a motion for summary judgment ... because proof of lack of exhaustion generally requires [the Court to] resort to matters outside the pleadings, such as affidavits and documentary evidence." *Hollis v. Erdos*, 480 F. Supp. 3d 823, 830-31 (S.D. Ohio 2020) (citing *Daugherty v. K.S.P. Medical Department*, 2018 WL 1095820, at *3 (W.D. Ky. Feb. 27, 2018)). "When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455-456 (6th Cir. 2012)); *see also Blissit v. Fiquiris*, 345 F. Supp. 3d 931 (S.D. Ohio 2018) (granting summary judgment based upon inmate's failure to comply with Ohio's grievance process for excessive force claim, discussing burden of proof).

Defendant previously argued that Plaintiff had failed to exhaust his administrative remedies in a motion to dismiss. This Court denied that motion without prejudice to renew the argument on summary judgment. To provide context, the Court restates its prior analysis:

> Defendant's motion to dismiss rests on statements made by Plaintiff on the original complaint form that implied that Plaintiff may have failed to fully exhaust his administrative remedies. Within the body of the institutional complaint form, Plaintiff answered "no" to a question asking whether he had used the prison grievance process. In a narrative explanation, he alleges: "The institution still uses paper ones due to no Kiosk on R-Block or L-I & I took the steps of informal 1st no response & the inspector holds the grievances & asked another time through kites." (Doc. 4 at 2, PageID 33). Plaintiff alleges that he complained numerous times to prison authorities. (*Id.*)

> Relying on Plaintiff's statements, Defendant argues that Plaintiff failed to complete Ohio's three-step administrative exhaustion process. Exhaustion of available institutional remedies is "mandatory under the PLRA and unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also* 42 U.S.C. § 1997e(a) ….

However, the only statements regarding Plaintiff's use of the grievance process appear on the original complaint form; no such statements appear in the amended complaint, which is the operative pleading. "In a claim by a prisoner, failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants." *Napier v. Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 204). Because exhaustion is an affirmative defense, a plaintiff is not required to plead exhaustion in his complaint. And – unless a plaintiff has included allegations that convincingly show he has failed to exhaust – a defendant cannot win on this defense unless the defendant proves a lack of exhaustion. *Contrast Mattox v. Edelman*, 851 F.3d 583, 589 n.3 (6th Cir. 2017) (a court may dismiss a case even prior to service on defendants based upon a failure to exhaust "if the complaint itself makes clear that the prisoner failed to exhaust.") (quoting *Carbe v. Lappin*, 492 F.3d 325, 328 (5th Cir. 2007)). Because the amended complaint no longer contains any statements relevant to the issue of exhaustion, Defendant's motion should be denied as moot.

Even if a reviewing court were to consider the statements made in the original complaint, however, the undersigned still would recommend denial of the motion under the limited standard of review that applies to motions filed under Rule 12(b)(6)....

Considering that it is Defendant's burden to prove the lack of exhaustion based solely on the pleadings, the undersigned finds the statements made in the original complaint to be ambiguous. Construed liberally, Plaintiff appears to be complaining about the availability of the grievance procedure. A prisoner may demonstrate exhaustion of all "available" remedies, even if he did not complete Ohio's three-step process, if prison officials thwarted his attempts at exhaustion *Does 8-10 v. Snyder*, 945 F.3d 951, 965 (6th Cir. 2019) (collecting and discussing cases). Also, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross v. Blake*, 136 S.Ct. 1850, 1859, 578 U.S. 632, 643 (2016); *see also Troche v. Crabtree*, 814 F.3d 795, 800 (6th Cir. 2016) (holding that plaintiff had sufficiently exhausted without completion of step three of Ohio's process where prison officials failed to respond to his step two Notification of Grievance form).

(Doc. 20, PageID 117-119) (footnote omitted).

In his renewed argument on summary judgment, Defendant again cites to Plaintiff's statements in his original complaint that Defendants construe as an admission

that he did not fully exhaust. (Doc. 37, PageID 192, citing complaint at Doc. 4). But as previously explained, Plaintiff's original complaint was superseded by his amended complaint. Plaintiff made no "admissions" about his alleged failure to exhaust in the amended complaint. And construed liberally, the statements in the original complaint appeared to allege that he was frustrated in his attempts to fully exhaust by Defendants' failure to respond to his ICR at step one and failure to provide him with the requisite appeal forms. The undersigned therefore remains unpersuaded by Defendant's renewed argument that he is entitled to summary judgment based on statements made in Plaintiff's original complaint.

Relevant to the implication that Plaintiff was frustrated in his efforts to exhaust, Plaintiff filed discovery requests on June 13, 2022 seeking the production of documents, including but not limited to "kites, informals, grievances, appeals, [and] use of force reports" about the October 25, 2021 incident. (Doc. 7). Attached to Plaintiff's written discovery requests were copies of five canary yellow informal complaints ("ICRs") concerning Plaintiff's efforts to administratively exhaust his claims. The Court entered an Order *sua sponte* striking Plaintiff's procedurally improper discovery requests from the record. *See* S.D. Ohio Cv. Rule 7.2(e). But the same Order acknowledged that Plaintiff had attached potentially relevant ICRs to his improper discovery requests without explanation. The Court advised Plaintiff that the documents would be stricken to the extent they related to his discovery requests, but that he could re-file the grievance documents with an appropriate motion.

> The Court is unable to discern whether these documents were provided in an attempt to supplement his Complaint or if they were provided in support of his request for production of documents. Therefore, if Plaintiff intended to supplement the record with these documents, he should separately file

the necessary motion with the Court for consideration.

(Doc. 8, PageID 55-56) (emphasis added).

Plaintiff did not accept the Court's instruction to file a motion if he wanted the Court to consider the stricken ICRs. Instead, on August 30, 2022, Plaintiff filed a "Notice of Submitting Additional Evidence" that attached copies of only two of the stricken ICRs.[5] (Doc. 14). Defendant promptly moved to strike the "Notice." (Doc. 17). On October 19, 2022, this Court denied the motion to strike as moot, consistent with the denial of Defendant's motion to dismiss. (Doc. 21, PageID 122). But the Order also agreed that the "Notice" was procedurally improper, and stated the Court will take "no further action …on Plaintiff's improperly filed documents." (Doc. 21 at ¶2, PageID 124).

In his opposition to Defendant's motion for summary judgment, Plaintiff generally urges this Court to review "the evidence the Plaintiff presented to the courts [sic] that's in [the] docket." (Doc. 39, PageID 277). More specifically, he argues that he has "already shown he's tried multip[le] times to exhaust all his administrative remedies" and "sent the courts copies of informal complaints…." (Id., PageID 278). But Plaintiff faces a procedural hurdle – he failed to move the Court to re-file the previously stricken ICRs.

Despite having been stricken from the public electronic record, the Court retains access to the exhibits. In the interests of justice and so that any reviewing court will have a more complete record, the undersigned summarizes them now. The first ICR, dated as submitted on 10/26/21, states: "I was dragged from the property room all the way to the Hallway 4 no reason I filled out a use of force complaint In Capt Office." (Doc. 7, PageID 49). The second ICR, dated 2/19/22, complains that Plaintiff has written "informals since

_____

[5]The re-filed copies were of ICRs dated April 5, 2022. To be fair, it is unclear whether Plaintiff retained extra copies of all the ICRs that were originally stricken, which appeared to be original forms.

Oct. 25, 2021" to which he received no response and had "no access to the kiosk stopping me filing my 3 remides [sic]…." (Doc. 7, PageID 50). A third ICR, dated 3/25/22, states: "I still haven't heard a response to any informals can I please get grevence [sic] form!" (Doc. 7, PageID 53). A fourth ICR, dated 4/5/22, reads: "Wondering why I haven't been getting no response on grievances to none of my informals We don't have no access to the kiosk in seg. & you & all the staff make us do paper ones because of that Im just wondering why yall aint doing all the steps." (Doc. 7, PageID 51 (punctuation original)). The fifth ICR, also dated 4/5/22, states: "Today I just got a Notification of Grievance for the 1st time. I haven't even got one 4 my assault 10/25/21. But it came with no canary or pink paper for to keep proof but I filled out!" (*Id.*, PageID 52).

In support of his renewed argument on the exhaustion issue, Defendant has filed a Declaration by the Assistant Chief Inspector with ODRC, Ms. Collins, who identifies herself as a records custodian for "direct grievances" and "appeals." (Doc. 37-1, ¶ 3). According to Ms. Collins, Plaintiff "did not submit **any** grievances during the months of October or November 2021." (*Id.*, ¶ 4 (emphasis original)). Based on the date of the incident on October 25, 2021, Plaintiff would have had to file at least a "step one" ICR within fourteen days, or no later than November 7, 2021. But Ms. Collins states that Plaintiff "did not file a grievance or submit a 'kite' regarding the incident on October 25, 2021." (Doc. 37-1 at ¶15). Defendant also has filed an institutional log of all grievances, and a partial record of informal "kites."[6] (Docs. 37-2, 37-3). According to those records, Plaintiff filed no grievances between the date of the incident on October 25, 2021 and

---

[6]Ms. Collins attests that she also has reviewed the "electronic kite file…for the specific time period of October 1, 2021 through January 31, 2022." (Doc. 37-1 at ¶ 14). The attached "kite" record contains no records outside of October 2021, with most "kites" dated before the October 25 incident.

March 23, 2022, when Plaintiff first filed a grievance concerning a reported use of force against him. The same record reflects that Plaintiff filed a second use-of-force grievance on April 4, 2022.[7] (Doc. 37-2; *see also* Doc. 37-3, electronic record of kites.).

Because Plaintiff did not formally move to re-file the stricken ICRs, Ms. Collins's statement that Plaintiff did not submit any timely ICRs or make any attempt to exhaust his excessive force claim is technically uncontested. Still, the undersigned cannot help but be troubled by the fact that Defendant's records conflict with the stricken ICRs, which include two ICRs dated 10/26/21 and 2/19/22. Those dates contradict Defendant's representation that Plaintiff submitted nothing at all between October 25, 2021 and March 23, 2022.

The Court also finds troubling the fact that Defendant has not filed copies of the March 23 or April 4, 2022 grievances that are identified by Defendant as concerning a "use of force" incident. The Court is left to wonder if either refers to the October 25, 2021 incident. If so, what was the response? Because exhaustion is an affirmative defense, a defendant can waive an inmate's failure to comply with time limits or other procedural requirements. When the Court denied Defendant's prior motion to dismiss without prejudice to renew the exhaustion defense on summary judgment, the Court specifically noted: "Typically, in the context of a summary judgment motion… a defendant will provide an affidavit by an institutional records keeper that verifies what (if any) administrative steps the plaintiff took to exhaust prior to filing suit, <u>as well as copies of relevant grievances and appeal forms</u>. Doc. 20 at n.5 (emphasis added).

Defendant's renewed motion provides a statement by the records custodian, Ms.

---

[7]Defendant does not include copies of these two grievances; therefore, the Court is unable to ascertain whether they concern the 10/25/21 incident or some other event.

Collins, that Plaintiff did not file a single grievance concerning this incident. And Defendant implies that any grievances submitted in March or April would have been untimely, though Defendant does not identify the subject matter of those grievances beyond the admission that they concerned a "use of force."

The undersigned finds that Defendant's failure to submit copies of the referenced March and April grievances leaves the record ambiguous even if the Court disregards the stricken ICRs and considers only Defendant's exhibits. The Defendant has the burden of proof on this affirmative defense. Because Defendant still has not fully satisfied that burden, the undersigned recommends denial of summary judgment on the exhaustion issue.

### B.  The Elements of an Eighth Amendment Claim

As procedural exhaustion does not foreclose Plaintiff's excessive force claim, the undersigned now turns to the merits of that claim. Both parties seek summary judgment on the merits. The Eighth Amendment prohibition on cruel and unusual punishment protects prison inmates from the "unnecessary and wanton infliction of pain." *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078 (1986)). But courts have been careful not to "constitutionalize" every use of force that occurs in a prison setting. To prove an excessive force claim that violates the Eighth Amendment, therefore, a plaintiff must show both a subjective and an objective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014).

### 1.  The Subjective Component

In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court reiterated that the subjective component of an excessive force claim focuses on "'whether force was applied

in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.*, 503 U.S. at 6, quoting *Whitley*, 475 U.S. at 320-321. In making this inquiry, the Court must consider the need for the use of force; the relationship between that need and the type and amount of the force used; the threat reasonably perceived by the official; and the extent of the injury inflicted. *Id.,* at 7; *Whitley*, 475 U.S. at 320.

Urging the Court to grant summary judgment in his favor, Defendant argues the use of force was constitutionally permissible to maintain or restore discipline; namely, to force Plaintiff to obey an order to stand up and return to Plaintiff's cell. "Defendant, due to [Plaintiff's] non-compliance, physically made Plaintiff comply with the direct orders given." (Doc. 37, PageID 194). According to Defendant, "[b]ut for Plaintiff's own disrespectful, combative behavior, none of this would have happened." (*Id.*, PageID 195). In support, Defendant points to the unsworn statements he made to the UOF Committee.

But in his verified complaint, Plaintiff denies that Defendant gave him any direct order to return to his cell or that he physically resisted Defendant in any way. There is no audio record of what transpired, and the video evidence does not support Defendant's assertion that Plaintiff was "combative." This Court cannot resolve disputed issues of material fact on summary judgment. "Facts that are not blatantly contradicted by [the audio or video record] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011).

In considering Defendant's motion, then, the Court must assume that Defendant gave no verbal order before beginning the forcible transport. Despite the lack of notice to Plaintiff, there is no dispute that Defendant's intention was to return Plaintiff to his cell.

Other undisputed facts can be determined from the video record. In considering whether this case should proceed to trial, the undersigned has reviewed that video frame-by-frame multiple times as well as other evidentiary exhibits. The undersigned concludes that a reasonable jury could find that Defendant Eash reacted inappropriately in anger to Plaintiff's questioning when he yanked Plaintiff out of the chair to transport him to his cell. But to prove his Eighth Amendment claim, Defendant's intention must have been for "the very purpose of causing harm." *Hudson*, 503 U.S. at 6.

Here, despite Defendant's anger and failure to comply with institutional policy, Defendant's foremost purpose was to transport Plaintiff back to his cell. Although his actions reflect that he cared little about Plaintiff's comfort during that transport, the record does not demonstrate Defendant's subjective intent to cause physical harm. That is not to say that an intent to transport (or other legitimate penological objective) absolves a defendant of all secondary malevolent intent. But the hallmark of such cases is evidence that shows a subjective intent to cause harm beyond the minor discomfort of a momentary push or shove. For example, in *Cordell*, 759 F.3d 573, the Sixth Circuit reversed the lower court's grant of summary judgment in a case involving an inmate transport. There, however, the evidence construed in plaintiff's favor suggested that the defendant used the plaintiff as "a human battering ram" by ramming him headfirst into a wall, causing a laceration that bled profusely and required five stitches to close, aggravating a preexisting degenerative condition, and leading to chronic pain syndrome. *Id.* at 582-583. By contrast, all evidence of record in this case, including but not limited to the video record, fails to show the level of subjective intent required to prove a violation of the Eighth Amendment.

## 2. The Objective Component

Even if a reviewing court were to disagree with the above analysis of the subjective component of Plaintiff's claim, the undersigned alternatively concludes that Plaintiff cannot prove the objective component of his claim. "The objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Ci. 2011) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). That does not mean that a plaintiff is required to prove a serious injury. But it does mean that "[t]he objective component of an Eighth Amendment claim is… contextual and responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 8 (additional citation omitted). In other words, the Court must consider in context both the type and amount of force used, and whether any actual threat was posed by Plaintiff.

In seeking summary judgment in his favor, Plaintiff relies almost exclusively on the UOF report as proof of the contextual circumstances of his claim. It is true that the report concluded that there was no apparent threat either posed by Plaintiff or perceived by Defendant Eash, because Plaintiff was physically non-combative[8] and was seated in a chair restrained by leg irons and hand restraints. (Doc. 37-6, PageID 253). The UOF investigation also concluded that Defendant's "actions were unacceptable period." (*Id.*) Plaintiff now argues that those UOF findings (including the fact that Defendant was disciplined) are conclusive on whether the Defendant violated the Eighth Amendment. (Doc. 36, PageID 185-86). They are not. A Use-of-Force Committee considers whether institutional policies have been followed, not whether constitutional standards have been

---

[8]The UOF report draws no conclusion on whether Defendant gave Plaintiff a verbal order to return to his cell, or the nature of the verbal exchange between the parties prior to Defendant's physical engagement with Plaintiff.

violated. The difference between the violation of an institutional policy and the Eighth Amendment can be vast. In short, while the Use-of-Force Committee's findings are not irrelevant, they neither mandate that summary judgment be granted to Plaintiff, nor preclude the grant of summary judgment to Defendant.

Returning to the analysis of Defendant's motion, objective standards evolve with "the progress of a maturing society." *See Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285 (1976). But just as "routine discomfort" will not state a conditions-of-confinement claim, not "every malevolent touch by a prison guard gives rise to a federal cause of action" for excessive force. *Hudson v. McMillian,* 503 U.S. at 9. In short, a *de minimis* use of physical force objectively will rarely if ever rise to the constitutional level of "cruel and unusual" punishment. *See Hudson*, at 9-10, quoting *Whitley*, 475 U.S. at 327 (additional internal quotation marks and citations omitted).

In evaluating an Eighth Amendment claim of excessive force, the central issue remains the amount of force used, not the amount of injury. Still, as the Supreme Court explained in *Wilkins v. Gaddy*, 559 U.S. 34, 130 S. Ct. 1175 (2010), an examination of a plaintiff's injuries remains meaningful:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry…. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Ibid.* …The extent of injury may also provide some indication of the amount of force applied. As we stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9, 112 S. Ct. 995. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Ibid.* (some internal quotation marks omitted).

*Id.* at 37-38. In *Wilkins*, the Supreme Court further explained that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.*, at 38 (cleaned up). Applying that standard, the undersigned concludes that no reasonable trier of fact could conclude that the force used by Defendant violated the Eighth Amendment.

The video record drives home that conclusion. To be clear, the undersigned does not condone Defendant's actions. But having viewed the video multiple times frame-by-frame, the undersigned concludes that the force used was *de minimis*, caused no injury, and was akin a "push or shove" that falls below the objective constitutional standard required to demonstrate an Eighth Amendment violation.

The physical contact between the Defendant and Plaintiff lasts for approximately 22 seconds, from 11:28:24 pm to 11:28:46 pm on the video record. Contact begins at 11:28:24 pm, when Defendant grabs Plaintiff's left arm and pulls him out of the chair in which he is seated. That first interaction takes approximately 3.5 seconds. The suddenness of Defendant's yank catches Plaintiff off-guard, causing him to abruptly leave the chair and fall to his knees. With his grip on Plaintiff's arm secure, Defendant continues moving toward a hallway, dragging Plaintiff along on his knees for 3-4 seconds. But by 11:28:32 pm (approximately 8 seconds from the initial arm grab), Plaintiff is regaining his footing in leg irons to walk upright. Based on Plaintiff's position, Plaintiff is forced to briefly walk backwards (approximately 2.5 seconds) until at 11:28:34:78, Defendant turns him around to face forward. At all times, Defendant keeps a secure hold of Plaintiff's arm. The parties continue walking until they are out of camera's view.

A second camera picks up their image at 11:28:43 pm, as the two proceed through

19

a doorway from the pack up area to a hallway. The second camera angle is slightly obscured by a metal detector. Still, enlarging the image frame-by-frame shows that Plaintiff begins to fall as the two walk through the doorway into the hallway.[9] Plaintiff's fall in turn causes Defendant to lose his balance. The parties fall together for about 2 seconds. At the end of the fall at 11:28:45, Defendant's knees momentarily contact Plaintiff. Less than a second after that contact, at 11:28:46 pm, Defendant scrambles to his feet and is no longer in physical contact with Plaintiff, who remains prone on the floor until other officers arrive on the scene. A correctional officer walking in the hallway observed the incident. Less than 30 seconds later, a third officer arrives to assist, and Plaintiff is transported to the infirmary.

The video evidence unequivocally shows that the force used was both brief and *de minimis*. In addition, Defendant offers unrebutted medical evidence that Plaintiff's only injury was *de minimis*. A contemporaneous clinical examination record signed shortly after the incident states:

> Objective Physical Findings: Adult black male in no distress. Gait steady. Skin w/d. color natural. resp easy and even. Lungs CTA. Heart sounds regular S1, S2. Abd soft, nontender, nondistended. + BS x 4 quads. No bruising noted to abdomen. Very superficial mark/abrasion post left shoulder - no bleeding. No other visible signs of recent injury noted to head, neck, chest, back, or extremities Treatment administered: OTC tylenol 2 doses given to take 650mg q4h as needed. F/U as needed for persistent or worsened sx. Pt released back to restrictive housing.

(*See* Doc. 36-5, PageID 215).

In opposition to Defendant's motion and in support of his cross-motion for summary judgment, Plaintiff complains that he has no ability to offer contrary medical evidence

---

[9] Although Defendant suggests Plaintiff may have intentionally gone limp or otherwise caused the fell, the reason for Plaintiff's fall is not clear from the video.

because he is "not a doctor or in the medical field." (Doc. 36 at 2). He suggests that this Court should discredit the medical record because the LeCI nurse "didn't take a real look at me even though I was in pain." (*Id.*)

But at the end of the day, the lack of discernible injury combined with the *de minimis* use of force shown on the video remains undisputed. Other medical records dated after the incident bolster the conclusion that the force used was akin to the type of "push or shove" that falls below the constitutional threshold required to prove an Eighth Amendment claim. Those records reflect multiple routine medical visits for various maladies (feet pain/itch, ear pain, dental, stiff neck) beginning on November 15, 2021 and continuing through December 26, 2021. (*See* Doc. 37-5). None reference any requests for follow-up care concerning any alleged injury from October 25, 2021.

The physical movement of an inmate from one location to another is a routine part of prison life. Despite the Defendant's questionable judgment and unprofessional conduct in roughly initiating that transport without calling for a supervisor (and possibly without giving any clear verbal command), the contextual force used to transport Plaintiff falls short of what is required to prove an Eighth Amendment violation as a matter of law. Plaintiff complains about "extreme" pain when Defendant's knees contacted his abdomen during the fall. But no reasonable jury could find that contact was intentional, and no injury resulted. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Pelfrey v. Chambers*, 43 F.3d 1034, 1039 (6th Cir. 1995) (internal quotation marks and citation omitted). *Accord Bullocks v. Hale*, 476 F. Supp. 3d 639, 648 (S.D. Ohio 2020) (granting summary judgment where inmate's minor injuries including swelling and bruising suffered during transport

evidenced the type of force that "does not as a general matter offend traditional standards of decency"); *Brooks v. Dillow*, No. 1:15-cv-812, 2016 WL 6493419, at *10 (S.D. Ohio Nov. 2, 2016), adopted at 2016 WL 703424 (S.D. Ohio Dec. 2, 2016) (granting summary judgment in case offering "a nearly textbook example of an inmate who complains of a 'push or shove' that has caused no discernible injury"); *Israfil v. Woods*, No. 1:09-cv-468, 2012 WL 4086906, at *5 (S.D. Ohio, Sept. 17, 2012), adopted at 2015 WL 456876 (Feb. 3, 2015) (defendant's alleged ill intent in raising Plaintiff's handcuffed arms behind his back in a manner that caused Plaintiff to lose his balance and fall face forward was not objectively serious enough to support a claim of cruel and unusual punishment in violation of the Eighth Amendment); *see also, generally*, *Matthews v.. Copeland*, 286 F. Supp. 3d 912, 916 (M.D. Tenn. 2017) (granting summary judgment to defendants in part because the plaintiff's injuries from ankle shackles, including swelling and lacerations, were too *de minimis* to support Eighth Amendment claim)[8]; *Peterson v. Johnson*, 2011 WL 1627924, at *6 (W.D. Mich. 2011)("Minor injuries such as bruises and swelling are generally insufficient to support a claim under the Eighth Amendment's Cruel and Unusual Punishments Clause," citing *Silguero v. Acheson,* No. 7:08–cv–201, 2009 WL 56341, at * 2 (N.D. Tex. Jan. 9, 2009) (collecting cases)).

**IV. Conclusion and Recommendations**

\*      For the reasons explained above, **IT IS RECOMMENDED THAT:**

     1. Plaintiff's motions for summary judgment (Docs. 30, 31) should be **DENIED**;

     2. Defendant's motion for summary judgment (Doc. 37) should be **GRANTED**; and

     3. This case should be **CLOSED**.


                            *s/Stephanie K. Bowman*
                            Stephanie K. Bowman
                            United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

RAYSHAWN J. PENN,

        Plaintiff,

    v.

C.O. EASH, et al.,

        Defendants.

Case No. 1:22-cv-262

McFarland, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party must respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).